UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 23-12063-GAO

JEANNY and KEVIN COUCELOS,
Individually and on behalf of their minor child
JOHN DOE,
Plaintiffs,

v.

CITY OF WOBURN,
WOBURN PUBLIC SCHOOLS,
WOBURN SCHOOL COMMITTEE,
JESSICA CALLANAN, Principal
of Woburn Memorial High School,
JIM DURAN, Athletic Director
of Woburn Memorial High School,
JACK BELCHER, Head Football Coach
for Woburn Memorial High School,
CHASE ANDREWS, Assistant Football Coach
for Woburn Memorial High School,
CHARLOTTE WEBBER, Spanish teacher
at Woburn Memorial High School,
Defendants.


ORDER ADOPTING REPORT AND RECOMMENDATION
September 26, 2024

O'TOOLE, D.J.

    The magistrate judge to whom this matter was referred has issued a Report and Recommendation (dkt. no. 26) ("R & R") recommending that the defendants' Motion to Dismiss (dkt no. 20) be granted in part and denied in part. Plaintiffs and Defendants each filed limited objections to the R & R. Defendants then filed a response to the plaintiffs' objections.

    Having reviewed the relevant pleadings and submissions, I concur with the magistrate judge's proposed rulings and overrule the parties' objections. The R & R is supported by detailed

analysis of the factual record and careful application of precedent. Therefore, the motion to dismiss is DENIED as to Counts I-III and is GRANTED as to Counts IV-X.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JEANNY and KEVIN COUCELOS,
Individually and on behalf of their minor child
JOHN DOE,
     Plaintiffs,

v.                                          CIVIL ACTION NO. 23-12063-GAO

CITY OF WOBURN,

WOBURN PUBLIC SCHOOLS,

WOBURN SCHOOL COMMITTEE,

JESSICA CALLANAN, Principal
of Woburn Memorial High School,

JIM DURAN, Athletic Director
of Woburn Memorial High School,

JACK BELCHER, Head Football Coach
for Woburn Memorial High School,

CHASE ANDREWS, Assistant Football Coach
for Woburn Memorial High School,

CHARLOTTE WEBBER, Spanish teacher
at Woburn Memorial High School,
     Defendants.

REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS
UNDER FED. R. CIV. P. 12(b)(6) (#20).

KELLEY, U.S.M.J.

I.      Introduction

This case involves a high school's response to the report of a "student-on-student" sexual assault.  Jeanny and Kevin Coucelos allege that while their 14-year-old son, John Doe, was a student at Woburn Memorial High School ("WMHS"), Woburn ("the City"), Woburn Public Schools ("WPS"), and the Woburn School Committee ("WSC") (together, the "Municipal Defendants") discriminated against Doe on the basis of gender in violation of Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681) (Count I); the Municipal Defendants are liable for the "erroneous outcome" of the Title IX investigation (Count II); the Municipal Defendants are liable for retaliation against Doe for reporting the assault (Count III); Principal Callanan, Athletic Director Jim Duran, Spanish teacher Charlotte Webber, and the Municipal Defendants violated Doe's constitutional substantive due process right to freedom from violation of bodily integrity (42 U.S.C. § 1983) (Counts IV and V); the Municipal Defendants discriminated against Doe on the basis of race under Title VI (42 U.S.C. § 2000(d)) (Count VI); Principal Callanan is liable for intentional infliction of emotional distress on plaintiffs (Count VII); the City and WPS are liable for both negligent and intentional infliction of emotional distress on plaintiffs (Counts VIII and IX); and Principal Callanan and WPS are liable for Doe's parents' loss of consortium under Massachusetts law (Mass. Gen. Laws ch. 231 § 85X) (Count X).

On November 27, 2023, defendants moved to dismiss all claims against them for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (##20, 21.) Plaintiffs oppose. (#22.) As explained below, the court recommends that the motion to dismiss be ALLOWED in part and DENIED in part.

II.      Facts

The facts are taken from the Complaint. (#1.)

2

A. <u>The Parties</u>.

Doe and his parents live in Woburn, Massachusetts. *Id*. ¶ 1. Doe is of Puerto Rican and Portuguese descent and identifies as Hispanic. *Id*. ¶ 18. The Municipal Defendants are the City of Woburn, WPS, a department operated by the City of Woburn, and WSC, which establishes educational goals and policies for WPS.[1]  *Id*. ¶¶ 2-4. The Municipal Defendants receive federal funding for educational programming and activities. *Id*. ¶ 22. During the time relevant to the Complaint: Jessica Callanan was the Principal of WMHS, *id*. ¶ 6; Jim Duran was the Athletic Director of WPS, *id*. ¶ 8; Jack Belcher was the head coach of the WMHS football team and had been since 2017, *id*. ¶ 9; Chase Andrews was an assistant coach of the WMHS football team, *id*. ¶ 10; and Charlotte Webber was Doe's Spanish teacher at WMHS. *Id*. ¶ 11.[2]

B. <u>The Locker Room Incident</u>.

During the 2021-2022 school year, Doe was in the ninth grade at WMHS and played on the football team. *Id*. ¶ 19. On September 25, 2021, he was fourteen years old. *Id*. ¶ 27. On that day, he was in the locker room after a game between Woburn and Wakefield, changing out of his football gear with other members of the freshman team.  *Id*. ¶ 28. Some sophomore players, who

---

[1] Defendants ask the court to dismiss the claims against WPS and WSC, because WPS is a department of the City and WSC "oversees WPS" and "including both WSC and the City as defendants is redundant." (#21 at 5.)  Defendants may well be right, but at this stage, where the court has little information about the roles of the Municipal Defendants in this case and their relationship to each other, the court declines to recommend dismissal of any of them.

[2] The Complaint names other defendants, but after conferring with defendants, *see* #20 at 1 n.1, plaintiffs filed a Notice of Voluntary Dismissal, dismissing some defendants from the case entirely, namely, Matthew T. Crowley, Superintendent of WPS, Michael Baldassare, Assistant Superintendent of WPS, Carl Nelson, Middle School Principal in WPS, and Scott Galvin, Mayor of the City. (#16.)  Other defendants were dismissed from certain counts, (for example, the Title IX claims originally named individual defendants, which is improper since there is no cause of action against individuals under Title IX, *see Frazier v. Fairhaven Sch. Comm*., 276 F.3d 52, 65 (1st Cir. 2002)), but those defendants are still named in other counts. *Id*.

were in another locker room across the hall, "decided to go into the freshman locker room and attack John Doe because some players blamed Doe for a team punishment earlier in the season." *Id*. ¶ 29.

A "large group of more than 20 football players" went into the freshman locker room, where they surrounded and attacked Doe, yelling, squirting water at him, and throwing bottles at him. *Id*. ¶ 30. Multiple students punched him, including in the face, injuring him. *Id*. Someone tried to take his Apple watch. *Id*. The attack was raucous and very loud. *Id*. One student, who was white and not Hispanic, pulled down Doe's pants and touched his genitalia through his boxers. *Id*. ¶ 31. Many students videotaped the incident, and videos of it were posted on social media. *Id*. ¶ 32. More than one of the recordings, with audio, are preserved. *Id*.

There was no supervision by coaches in the locker room before the assault or any intervention by coaches during the assault. *Id*. ¶ 33. Defendant Chase Andrews, an assistant coach for the freshman football team, was in the coach's office when the attack happened. *Id*. ¶ 34. That office is across the hall "and only several feet away from the entrance to the freshman locker room, close enough to hear a commotion in the locker room." *Id*. ¶ 35. Minutes after the attack, Doe went to the office and told Coach Andrews that he was "just jumped and assaulted in the locker room." *Id*. ¶ 36. Coach Andrews did not ask Doe for more information, did not report the attack, and did not request or conduct any investigation of the incident. *Id*. ¶ 37.

    C. <u>Events After the Assault</u>.

The Coucelos family reported the incident to the Woburn Police on October 12, 2021. *Id*. ¶ 38. The Woburn Police school resource officer, Edward Fumicello, told Principal Callanan about the attack that day. *Id*.  Mr. and Mrs. Coucelos met with Principal Callanan the next day, October 13, 2021. *Id*. ¶ 39. She assured them that Doe would be safe when he returned to school and Doe

and his parents relied on that assurance when Doe returned. *Id*. Principal Callanan interviewed about thirteen students who were involved in the incident. *Id*. ¶ 40. Defendant Jack Belcher, the head football coach at WMHS, and Defendant Jim Duran, the athletic director of WMHS, were present at times while students were interviewed. *Id*. Athletic Director Duran sometimes asked students questions. *Id*. Coach Belcher recalled later that players were asked questions including whether they saw anyone touch Doe's genitals; Principal Callanan later stated she did not ask about the alleged grabbing of Doe's genitals. *Id*. ¶¶ 41-42.

Principal Callanan did not preserve a video from surveillance cameras in the hallway outside the football locker room and coach's office, rather, "she allowed it to be deleted on or around October 25, 2021." *Id*. ¶ 43. Officer Fumicello had access to the video and viewed it. *Id*. The reason given by WPS "for allowing the video to be destroyed was that the video was not relevant," even though it would have shown "people going in and out of the freshman locker room, sophomore locker room, and the coach's office." *Id*.

Over the next several weeks, Doe was "subjected to physical attacks, threats, intimidation, and cyber-harassment by several WMHS students." *Id*. ¶ 44. On October 18, 2021, he was approached in a school bathroom by three students who taunted him by asking him, "Why didn't you stick up for yourself [during the locker room incident]?" *Id*. ¶ 45. One of the students punched him several times "in the upper body area." *Id*. This incident was reported immediately to Principal Callanan. *Id*. That same day, she sent a safety plan for Doe to his parents "for implementation starting the next day"; she said that it was shared with Doe's teachers. *Id*. ¶ 46.

Students "sent offensive messages" to Doe, for example, "on or about October 18, 2021, a student called John Doe out as a snitch, said everyone hated him, and targeted him with vulgar language." *Id*. ¶ 47. This was reported to Principal Callanan on October 19, 2021. *Id*. On November

9, 2021, a different student sent offensive messages to Doe, including: "you really want to get raped again, did you get brain damage from being raped, I'll do the same thing they did but only me." *Id*. ¶ 48. This also was reported to Principal Callanan. *Id*.

On November 10, 2021, a different student entered Doe's Spanish class, grabbed him by the shirt, pulled him up, told him to stop snitching, and to delete the screenshots "of the messages with the student from the day before." *Id*. ¶ 49. The teacher, Charlotte Webber, was in the classroom at the time of the incident "and did nothing to intervene." *Id*. This incident was reported to Principal Callanan. *Id*.

John Doe "received little active play time on the football field for the rest of the season." *Id*. ¶ 50. However, several players who had attacked him, including the one who sexually assaulted him, played on the team for the rest of the season, and at least three players, including the one who sexually assaulted him, played at the Thanksgiving game at Fenway Park on November 24, 2021. *Id*. "The WMHS Student Handbook states that students may lose the privilege of participation in interscholastic athletic events if the student violates the behavioral expectations of the school." *Id*.

On December 1, 2021, the Coucelos family obtained a Harassment Protection Order from the Middlesex County Juvenile Court against the student who sexually assaulted Doe. *Id*. ¶ 51. Only then did Principal Callanan and the WPS put a safety plan in school for that student. *Id*.

D. The Title IX Investigation.

The family filed a Title IX complaint with Principal Callanan and the WPS on November 22, 2021. *Id*. ¶ 52. The family had delayed filing a complaint, because Principal Callanan had sent an email to Mrs. Coucelos on October 25, 2021, in which she stated that "[u]sually a Title IX investigation involving a sexual assault takes place when the assault was for sexual gratification."

*Id*. ¶ 53. This email "confused the family and discouraged them from filing a Title IX complaint." *Id*.

On December 6, 2021, the family had a meeting with Assistant Superintendent Michael Baldasserre "to discuss Title IX." *Id*. ¶ 54. On December 7, counsel for the family "stated the family wanted to proceed with the Title IX complaint." *Id*. On December 10, Assistant Superintendent Baldassere informed the family that a school transfer might be arranged by WPS and asked the family whether, if the transfer happened, they would still be pursuing the Title IX investigation. *Id*. On December 14, counsel for the family asked Principal Callanan in writing about the status of the Title IX investigation. *Id*. ¶ 55. That same day, Assistant Superintendent Baldasserre responded "with an insulting letter" claiming that during the meeting on December 6, the family had not provided enough details about the September 25 attack, and thus the school was proceeding with a Title IX investigation only in response to counsel's letter of December 14. *Id*. ¶ 56.

The investigation proceeded; Carl Nelson, the principal of the Kennedy Middle School in Woburn, was assigned as the Title IX decision-maker. *Id*. ¶ 58. The family objected to the assignment of Principal Nelson because Doe's parents had "pulled him out" of the Kennedy Middle School in June 2019 because Doe had been bullied and harassed there and Principal Nelson had not responded properly. *Id*.

Principal Nelson issued a Title IX decision in May 2022.  *Id*. ¶ 59. He incorrectly said that a formal complaint had been made on December 14, 2022, and that the first safety plan for Doe was put in place on October 15, 2021. *Id*. He did not consider Doe's response to the Title IX investigator's report. *Id*. He incorrectly said he could not identify who grabbed Doe's genitals. *Id*. He incorrectly concluded that the grabbing of Doe's genitals on September 25, 2021, was severe

7

and objectively offensive but not pervasive because it was a single act, and therefore not sexual harassment as defined by Title IX. *Id*.  ¶ 60.

As part of the Title IX investigation, during an interview on January 21, 2022, Assistant Coach Andrews said he did not become aware of the September 25 incident in the locker room until two weeks later, during an interview with Principal Callanan. *Id*. ¶ 65. He also said that on Monday, September 27, 2021, Doe told him at a practice that "a couple players jumped him." *Id*. Assistant Coach Andrews "stated that he believed that jumping was a beat down," but because Doe did not have any physical signs from any altercation and he did not appear nervous, he decided he did not need to report anything to the coaching staff. *Id*. Principal Callanan told Assistant Coach Andrews "not to say anything and that the administration was taking care of the situation." *Id*. ¶ 66. Assistant Coach Andrews did not receive "any formal training with respect to hazing until after the incident." *Id*.

During the Title IX investigation, the head coach of the freshman football team, Chris Scichilone, said that his office is right outside the locker room, and he can hear when students are "loud and excited from a win." *Id*. ¶ 67. He said training related to hazing or Title IX only occurred after the September 25 incident. *Id*. Also during the Title IX investigation, Athletic Director Duran stated that coaches are not allowed in locker rooms while students are changing. *Id*. ¶ 71. However, the National Federation of State High School Associations, "the organization that writes the rules of competition for high school sports," has stated "at least as far back as 2020" that coaches have a duty to supervise student athletes in locker rooms. *Id*. ¶ 72.

There has been a "toxic culture" of bullying and assault on the WMHS football team "for years." *Id*. ¶ 73. Head Coach Belcher "was directly involved, bullying players himself and allowing physical assault and bullying between players." *Id*. Athletic Director Duran, Principal Callanan,

WPS, and the City "were aware of complaints and yet did nothing" to change the custom of "victory at all costs." *Id*.

On September 25, 2018, a 15-year-old WMHS football player was kicked in the head by a teammate "so hard … that he stumbled off the practice field and was sick." *Id.* ¶ 74. Other teammates taunted him and Head Coach Belcher bullied him. *Id*. Despite complaints from his parents to Principal Callanan, the bullying continued, and eventually the player had to be transferred to another school because of depression and anxiety. *Id.* Another football player who graduated in 2021 was bullied by his teammates, and even though the behavior was reported to Coach Belcher and Principal Callanan, nothing changed. *Id*. ¶ 75.

On or about February 15, 2022, Superintendent Matthew Crowley published a letter to the school community stating that all coaches would be required to "undertake extensive supplemental training to ensure our athletic programs are a safe, nurturing, and healthy experience" for participants. *Id*. ¶ 68. In June 2022, he told the Boston Globe that coaches were aware of the prohibitions against bullying and hazing "prior to the school year," which contradicted what he, Assistant Coach Andrews, and Coach Scichilone had previously said. *Id*. ¶ 69.

Lee Wilson, a parent of a WMHS football player who graduated in 2020, stated publicly that Coach Belcher's practice of pitting older, stronger players against other teammates was "known at the time." *Id*. ¶ 76.

WPS hired a consulting firm to assess the policies and procedures of the school district; the resulting report recommended that WPS "needs to institute a Policies and Procedures for the supervision of the locker room." *Id*. ¶ 77.  WSC approved a Student-Athlete Handbook in August 2022 and a "Woburn Athletics Coaches' Handbook was presented at that time as well." *Id*. ¶ 78. They were distributed to coaches and athletes for the 2022-23 school year. *Id.* In August 2022,

Athletic Director Duran proposed a monitor program to supervise students in locker room areas. *Id*. ¶ 79. "Such supervision would have prevented the attack by sophomores on John Doe in 2021." *Id*.

    E.  <u>Damages</u>.

As a result of these experiences, Doe became isolated and withdrawn, had difficulty sleeping and eating, became distrustful of others, and lost motivation. He only felt comfortable with those he knew and trusted, did not want to play football, and lost his best friend. *Id*. ¶ 61. He did not want to go to school, and his grades dropped. *Id*. ¶ 62.

On December 15, 2021, Doe's parents withdrew him from school because he was not safe. *Id*. He received tutoring until he transferred to a different school in February 2022. *Id*. He eventually had to be homeschooled. *Id*. He began seeing a psychiatrist. *Id*. ¶ 63. WPS conducted a psychoeducational evaluation of Doe in April 2022. *Id*.  ¶ 64. The evaluator concluded that he was experiencing anxiety and depression and met the diagnostic criteria for Post-Traumatic Stress Disorder as a result of the traumatic events he had experienced at school. *Id.*

Mr. and Mrs. Coucelos also suffered damages. Mrs. Coucelos suffered great anxiety, lost sleep, lost her appetite, and had low energy. She lost time from work. She feared for Doe's safety at school and also for her other children's safety. Mr. Coucelos "lost hundreds of hours of work" dealing with the incident. He was afraid for his son's safety and was nervous about his other children who were in Woburn public schools.  *Id*.  ¶¶ 80-82.

    III.   <u>Motion to Dismiss Standard</u>.

On a motion to dismiss for failure to state a claim, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff. *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, <u>647 F.3d 377, 383</u> (1st Ci<u>r. 2011</u>). While

detailed factual allegations are not required, the complaint must recite "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, <u>550 U.S. 544, 555</u> (2007), and it must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, <u>513 F.3d 301, 305</u> (1st Cir. <u>2008</u>) (internal quotations and citations omitted). The facts alleged, taken together, must "state a claim to relief that is plausible on its face." *A.G. ex rel. Maddox v. Elsevier, Inc.*, <u>732 F.3d 77, 80</u> (1st Cir. <u>2013</u>) (quoting *Twombly*, <u>550 U.S. at 570</u>). "A claim is facially plausible if supported by 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Eldredge v. Town of Falmouth*, <u>662 F.3d 100, 104</u> (1st Cir. <u>2011</u>) (quoting *Ashcroft v. Iqbal*, <u>556 U.S. 662, 678</u> (2009)).

When assessing the sufficiency of a complaint, the court first "separate[s] the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Maddox*, <u>732 F.3d at 80</u> (quoting *Morales-Cruz v. Univ. of P.R.*, <u>676 F.3d 220, 224</u> (1st Cir. <u>2012</u>)). Next, the court "determine[s] whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Morales-Cruz*, <u>676 F.3d at 224</u>). "[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernandez v. Fortuño-Burset*, <u>640 F.3d 1, 12</u> (1st Cir. <u>2011</u>) (quoting *Twombly*, <u>550 U.S. at 556</u>). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," however, a claim may be dismissed. *Iqbal*, <u>556 U.S. at 679</u>.

IV.  <u>Discussion</u>.

A.  <u>Count I – Violation of Title IX Against the City, WPS and WSC</u>.

1.  <u>Legal standard</u>.

11

Title IX provides that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280 (1998) (quoting 20 U.S.C. § 1681(a)).[3] Plaintiffs here assert a theory of hostile environment, according to which an institution may be liable for student-on-student sexual harassment. *See M.L. By and Through D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023). To successfully plead a Title IX claim against an educational institution, a student must sufficiently allege: that he or she was subjected to harassment; based upon sex; that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and that a cognizable basis for institutional liability exists. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002). The last part of the standard is met if a plaintiff plausibly alleges that an official at the school with authority to take corrective action had actual knowledge of the harassment and either failed to act or "exhibited deliberate indifference" to the harassment. *Willis v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999).

As stated above, to plausibly allege that the institution is liable, a plaintiff must adequately plead that first, an official of the institution who had authority to end the harassment had "actual knowledge of the harassment." *Grace v. Bd. of Trs., Brooke East Bos.*, 85 F.4th 1, 10-12 (1st Cir. 2023) (citing *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007) and *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011)). "The empty allegation that a school employee 'failed to report' harassment to someone higher up in the chain of command who could have taken corrective action is not enough to establish institutional liability." *Santiago*, 655 F.3d at 73-74. Plaintiff need only show that one employee authorized to act had knowledge. *See Fitzgerald v.*

---

[3] It is undisputed that WMHS is a recipient of federal funding.

*Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009)), *rev'd on other grounds*, 555 U.S. 246 (2009) ("a Title IX Plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference.").

A plaintiff must also plausibly allege that the official's response to the harassment amounted to deliberate indifference. *Doe v. Pawtucket Sch. Dept.*, 969 F.3d 1, 9 (1st Cir. 2020). Deliberate indifference "is a stringent standard of fault" that requires proof that a defendant "disregarded a *known or obvious* consequence of his action or inaction." *Porto*, 488 F.3d at 73 (emphasis in original) (quotation marks omitted) (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). Put another way, the institution's actions, or failure to act, must have "caused the student's subsequent harassment in some way or made the student 'liable or vulnerable' to harassment." *Id*. (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ*., 526 U.S. 629, 645 (1999)). "[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference; in the Title IX context, 'funding recipients are deemed deliberately indifferent to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id*. at 73 (quoting *Davis*, 526 U.S. at 648).

2.  The parties' positions.

Plaintiffs claim that defendants were "deliberately indifferent to the culture and environment that allowed John Doe to be harassed and attacked in 2021 and to the harassment and assault he actually suffered," that "the harassment was severe, pervasive and objectively offensive," and that Doe was deprived access to educational opportunities at WMHS as a result. (#1 ¶ 88.) The facts alleged to support the allegation of deliberate indifference include "a) failure

to supervise the locker room; b) encouragement of a toxic culture on the football team that promoted bullying and assault; c) no immediate response to the reporting of the assault; d) discouragement from filing a Title IX complaint; e) delay and ineffectiveness of supportive measures that allowed further attacks and bullying; f) delay in conducting the Title IX investigation; g) John Doe's little active play time on the football field for the rest of the season while others, including the student who sexually assaulted him, were allowed to participate; h) John Doe's anxiety and depression and lost interest in football; and i) John Doe leaving school." *Id*. ¶ 89.

Defendants assert that plaintiffs have not adequately pled: that the school had "actual knowledge" of the alleged discrimination (#21 at 6-7); that the acts alleged constitute sexual harassment under Title IX, *id*. at 7-8; and that the defendants acted with "deliberate indifference" to the harassment, *id*. at 8-11.

3. The Complaint adequately alleges that the school had "actual knowledge" of the discrimination.

Defendants argue that the Title IX counts should be dismissed because of lack of knowledge "to the extent the claims rely on the knowledge of the coaching staff…" (#21 at 7.) This is true but beside the point, as the Complaint alleges that Principal Callanan was informed about the locker room incident and every subsequent incident of harassment and there is no question that she had authority to take corrective action. The Complaint adequately alleges knowledge.

4. The Complaint adequately pleads discrimination on the basis of sex.

Title IX does not apply if conduct is "merely tinged with offensive sexual connotations"; rather, the conduct must amount to discrimination because of sex. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 258 (1st Cir. 1999); *Frazier*, 276 F.3d at 66; *Oncale v. Sundowner*

*Offshore Servs., Inc*., 523 U.S. 75, 81 (1998). Here, the question is whether the attack on Doe was sexual harassment or merely "undifferentiated bullying." *Morgan v. Town of Lexington, MA*, 823 F.3d 737, 740 (1st Cir. 2016). Whether bullying that includes arguably sex-based harassment amounts to sexual harassment actionable under Title IX depends "on a constellation of surrounding circumstances, expectations, and relationships … including, but not limited to, the harasser's and victim's ages and the number of persons involved." *Davis*, 526 U.S. at 631 (citing *Oncale*, 523 U.S. at 82.

Two allegations in the Complaint involve sexual harassment. The first is the incident in the locker room, which Doe alleges happened because sophomore players decided to attack Doe "because some players blamed John Doe for a team punishment earlier in the season." (#1 ¶ 29.) As described above, Doe was being attacked by a large group of students who were, among other things, yelling at him and hitting him, when one of them pulled Doe's pants down and grabbed his genitals. *Id*. ¶¶ 30-31. The Complaint describes several harassing events following this incident, including one in which three students taunted Doe in a bathroom and one of them hit Doe, *id*. ¶ 45; one in which a student called Doe "a snitch," *id*. ¶ 47; and another where a student grabbed Doe's shirt in a classroom and told him to stop snitching and to delete messages he had received from another student, *id*. ¶ 49. Out of all the post-locker room incidents, the only one that could be said to be harassment on the basis of sex was when Doe received a communication from another student asking in substance if Doe wanted to "get raped again." *Id.* ¶ 48.

A single act of peer-on-peer harassment may form the basis for Title IX liability "if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Fitzgerald,* 504 F.3d at 172-73. Cases involving a single act or only a few acts that have been

deemed "vile enough" generally involve allegations that a student was raped. *See, e.g., Doe v. Pawtucket Sch. Dept.*, 969 F.3d at 10 (allegation that student was assaulted in class and then raped twice sufficiently severe and pervasive to form basis of Title IX liability); *Roe v. Lincoln Sudbury Regional Sch. Dist.,* Civ. No. 18-10792-FDS, 2021 WL 1132256, at *24 (D. Mass. March 24, 2021) (allegation that in a single episode female student was restrained, digitally penetrated, and forced to perform sexual acts on two students sufficiently severe and pervasive) (collecting cases); *T.K. v. Town of Barnstable*, Civ. No. 17-11781-DJC, 2018 WL 3748166, at *4 (D. Mass. Aug. 6, 2018) (allegation that female student was drugged and raped in stairwell of school sufficiently severe and pervasive).

This is not to say that harassing conduct must "be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Morgan*, 823 F.3d at 745 (quoting *Oncale*, 523 U.S. at 80) (quotation marks removed)). A student may have a Title IX claim if the student is the target of sex-based stereotypes including name-calling by peers, although the conduct generally must have occurred repeatedly and over a long period of time. *See, e.g., Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 344 (D. Mass. 2016) and cases cited; *Doe v. Bd. of Trustees, Brooke East Boston*, 85 F.4th 1, 5-8 (1st Cir. 2023) (holding that student was subjected to harassment on the basis of sex under Title IX when other students discriminated against him numerous times over a period of three years, because they thought he was gay).

Courts have found that the fact that a student suffered some harassment arguably based on sex while being bullied is not enough to make out a Title IX claim. In *Morgan*, the complaint alleged that a 12-year-old student was bullied many times in a non-sexual manner and also had his pants pulled down on several occasions in front of other students. 823 F.3d at 740. The First Circuit found that "the pulling down of the pants by and large seems clearly to be an adjunct to the bullying

on the basis of other considerations," and held that the alleged conduct was not "severe and/or pervasive" enough to "supply a sexual harassment claim under Title IX," affirming the district court's denial on the basis of futility of a motion to amend the complaint to add a Title IX claim. *Id*. at 745. In *Hankey v. Town of Concord-Carlisle*, 136 F. Supp. 3d 52 (D. Mass. 2015), the district court allowed summary judgment for school officials where plaintiff repeatedly was subjected to bullying and threats but only one sexually degrading epithet was directed against her ("cunt"). The court found that where the sexual or gender-specific conduct was not "repeated" or "pervasive," a jury could not reasonably find that the bullying and threats were sexual in nature or based on plaintiff's gender. *Id*. at 68.

In contrast, in *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279 (D. Mass. 2017), in the context of a 12(b)(6) motion to dismiss, the district court held that where a student was raped with a broom by other students at a football camp, after which he was subjected to "extensive student on student sexual harassment for a whole year … including sexually degrading epithets," plaintiff had adequately pled that a "sexually charged hostile environment" was "repeated and pervasive." *Id*. at 308.

This is a close case. There are only two incidents here that could be said to be harassment based on sex. The locker room assault, although terrible, was not as egregious as that alleged in *Thomas*, and there was only one post-assault incident that could be said to be based on sex, while in *Thomas*, there were numerous post-assault incidents that constituted sexual harassment. One might rely on *Morgan* for the proposition that the conduct alleged here was not gender-based. After all, according to the Complaint, the locker room incident was initiated because students thought that Doe was responsible for a team punishment, not to persecute him for his gender orientation or

to rape him, and the post-assault bullying mainly consisted of students telling Doe to stop being a "snitch."

The facts here, however, differ in significant ways from the facts in *Morgan*, where a middle-school student was bullied in a non-sexual manner many times and in addition had his pants pulled down in front of other students more than once. As the First Circuit found, the pants-pulling, although certainly unpleasant and humiliating for the victim, was seen as more of a cruel prank than a sexual assault. The harassment against Doe, in contrast, began with an incident in which he not only had his pants pulled down but was then sexually assaulted by a student, in front of a large group of students who were simultaneously taunting and physically assaulting him. Doe and his tormenters were older than the students in *Morgan*, thus making the act of pulling down his pants and grabbing his genitals more serious than the behavior in *Morgan*. The Supreme Court's instruction in *Davis*, 526 U.S. at 631, to consider the "harasser's and victim's ages and the number of persons involved" in deciding whether alleged behavior constitutes sex-based harassment, tips the scales in favor of finding such harassment here. The subsequent communication from another student asking Doe if he wanted to be "raped again" reinforces the gravity of the conduct in the locker room and supports its classification as a sexual assault rather than mere bullying. Whether the harassment was "pervasive" is a closer question, but at this stage of the case plaintiff has adequately, if barely, pled it.

The court finds that on balance Doe has adequately pled that the sexual incidents alleged here rise to the level of "repeated and pervasive" discrimination on the basis of sex.

5.  The Complaint adequately pleads that WMHS was deliberately indifferent to Doe's complaint.

To repeat, to successfully plead a claim of sexual harassment under Title IX, a plaintiff must allege that an official authorized to take corrective action had "actual knowledge" of the

18

harassment and either failed to act or exhibited "deliberate indifference" to it. *Gebser*, <u>524 U.S. at</u> <u>90</u>; *Frazier*, <u>276 F.3d at 66</u>. Here, Principal Callanan did not fail to act, rather, plaintiffs allege that the safety plan she implemented was ineffective because the harassment of Doe continued after it was issued; some of the students who attacked him were not punished in accordance with school policy; and a safety plan against the student who sexually attacked Doe was not implemented in a timely way. (#1 ¶¶ 46-51.) Drawing all reasonable inferences in plaintiffs' favor, plaintiffs have adequately alleged that Principal Callanan's response to the assault was inadequate. (#1 ¶ 51; #22 at 6.)  Although the court recognizes that whether an institution's action or inaction constitutes "deliberate indifference" to a complaint of harassment "is a stringent standard of fault," *Porto*, <u>488</u> <u>F.3d at 73</u>, and that at a later point in this case plaintiffs may well have difficulty meeting that standard, at this stage the court recommends that the motion to dismiss Count I be denied.

B.  <u>Count II – Violation of Title IX, Based on Erroneous Outcome Against the City, WPS</u> <u>and WSC.</u>

To assert a claim of erroneous outcome based on gender bias, plaintiffs must (1) allege facts that "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) allege that "gender bias was a motivating factor." *Doe v. Trustees of Boston College*, <u>892 F.3d 67, 90</u> (1st Cir. 2018) (quoting *Yusef v. Vassar College*, <u>35 F.3d 709, 715</u> (2nd Cir. 1994)) (quotation marks omitted). The Complaint asserts that "[d]efendants biased [sic] John Doe in the design and enforcement of Woburn's policy related to Title IX. John Doe suffered an erroneous outcome in the Title IX determination due to procedural flaws in the complaint, investigation, and determination process." (#1 ¶ 95.)  Plaintiffs assert that they were wrongly discouraged from filing a Title IX complaint, *id.* ¶¶ 54-56, and that the Title IX investigation came to an erroneous conclusion because Principal Nelson got facts wrong and did not take into account Doe's response to the Title IX report, *id.* ¶ 59. The Title IX decision itself was allegedly incorrect

because Principal Nelson concluded that the incident of September 25, 2021 was severe and objectively offensive, but not pervasive because it was a single act, and thus did not constitute sexual harassment under Title IX. *Id*. ¶ 60.

The pleading burden as to the first prong "is not heavy," *Yusuf*, 35 F.3d at 715, and plaintiff has met it here, as the Title IX findings plausibly are alleged to be erroneous in holding that one incident was not "pervasive" sexual harassment under Title IX (this finding also was incorrect as to the number of incidents, because as explained above, there were two incidents implicating sexual harassment). The Complaint also alleges "particular procedural flaws affecting the proof," *id*., for example, that Principal Nelson got the facts wrong. *See* #1 ¶ 96; *Doe v. Harvard Univ*., 462 F. Supp. 3d 51, 61 (D. Mass. 2020) (holding that allegations that alleged victim of sexual assault had motive to lie, along with allegations of procedural flaws in Title IX investigation, adequately made out first prong of erroneous outcome claim).  The court therefore moves to the second part of the test.

Plaintiffs' support for the allegation that Doe's gender was a motivating factor in the outcome of the Title IX investigation is that "the boys-will-be-boys and victory-at-all-costs culture of the boys WMHS football team" led to the coaches and Principal Callanan's "acceptance of bullying and assault."  (#22 at 7, citing Complaint, #1 ¶¶ 73-74.) "This culture also drove Principal Callanan to discourage the Plaintiff from filing the Title IX complaint because she limited Title IX to a sexual assault involving sexual gratification." (#22 at 7, citing Complaint, #1 ¶ 53.) In sum, "[t]he history and circumstances of this case are infused with a gender-based bias that boys behave in a certain way, an assumption that was a motivating factor in both the procedural and substantive aspects of the Title IX process here." (#22 at 7.)

The question whether the Complaint sufficiently pleads that gender bias was the motivating factor behind the allegedly erroneous Title IX decision is difficult to answer. The fact that Principal Callanan believed that Title IX was limited to cases involving "sexual gratification" may not indicate that she was discouraging the filing of a Title IX complaint because of gender bias but may only indicate that she had a mistaken understanding of Title IX liability. In addition, the alleged "boys-will-be-boys" culture may not be gender-based but may simply be a practice of encouraging bullying behavior coupled with a lack of supervision by the school; such a pernicious practice could be followed in girls' sports as well. Nevertheless, at this stage in the case, taking the facts alleged as true and drawing all reasonable inferences in favor of plaintiffs, the court finds that plaintiffs have adequately pled this claim.

The court recommends that the motion to dismiss Count II be denied.

C.  Count III – Violation of Title IX, Based on Retaliation Against the Municipal Defendants.

Count III of the Complaint alleges that the Municipal Defendants are liable for the retaliatory acts of its employees after Doe reported the assault to coaches and Principal Callanan. Facts in support of the claim include Assistant Coach Andrew's failure to respond to Doe's immediate report of the assault; the fact that Doe got little playing time on the football team while his assailants played; the "delayed and ineffective supportive measures" for Doe; Principal Callanan's discouraging Doe from filing a Title IX complaint; delay in issuing a safety plan for the student who sexually assaulted Doe; and other similar shortcomings by officials at the school pertaining to the Title IX investigation. (#1 ¶ 102.)

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). "[A] plaintiff may establish a

prima facie case for a Title IX retaliation claim by alleging facts sufficient to show that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." *Frazier,* 276 F.3d at 67. The only factor at issue here is the last part of the test, that is, whether "a retaliatory motive played a substantial part in prompting any alleged adverse actions."[4] The adverse actions, as mentioned above, center around Doe's treatment by the coaches with regard to playing time and alleged deficiencies in the school's response to his complaint. Doe need not affirmatively establish the element of motive for pleading purposes; "the facts contained in the complaint need only show that the claim of causation is plausible." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 56 (1st Cir. 2013) (citing *Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 49 (1st Cir. 2012) ("'[s]moking gun' proof of discrimination is rarely available, especially at the pleading stage")). The facts alleged sufficiently state a claim for retaliation under Title IX. The court recommends that the motion to dismiss be denied as to Count III.

    D. Count IV, Violation of 42 U.S.C. § 1983 Against Principal Callanan, Athletic Director Duran, Head Coach Belcher, Assistant Coach Andrews, and Spanish Teacher Webber; and Count V, Violation of 42 U.S.C. § 1983 Against the Municipal Defendants.

---

[4] The standard of causation under Title IX is "an unresolved issue in this circuit." *Ing v. Tufts Univ.*, 81 F.4th 77, 84 n.5 (1st Cir. 2023). In *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020), the First Circuit noted that under Title VII, which supplies an applicable legal framework for Title IX claims, a claimant must show that the adverse action is "causally linked to the protected conduct," so that the employer's "desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citing *Univ. of Tex. Sw. Med. Str. v. Nassar*, 570 U.S. 338, 339 (2013)). "Neither the Supreme Court nor [the First Circuit] has resolved the question of whether *Nassar*'s holding on causation extends to Title IX retaliation claims given the import of Title VII to the adjudication of such claims." *Theidon*, 948 F.3d at 506. Here, under either standard --"but for" or "substantial part in prompting"-- the adverse action, the claim has been adequately pled.

Plaintiffs allege that that the individual defendants deprived Doe of his "substantive due process right to be free from violations of bodily integrity" and that their actions "shock the conscience and created or enhanced a danger to John Doe." (#1 ¶ 106.) Principal Callanan gave assurances of safety to Doe and yet "delayed and ultimately implemented ineffective supportive measures that allowed John Doe to continue to be attacked and bullied at school." *Id*. ¶ 107. Athletic Director Duran did not require coaches to supervise students in locker rooms. *Id*. ¶ 108. Head Football Coach Belcher created a toxic culture of bullying and assault, and school officials were aware of complaints related to such behavior before the locker room incident. *Id*. ¶ 109. Assistant Football Coach Andrews failed to supervise players in the locker room on the date of the incident and failed to immediately report the incident. *Id*. ¶ 110. Ms. Webber, the Spanish teacher, "was aware of John Doe's safety plan but allowed another student to attack and threaten him in her classroom on November 10, 2021." *Id*. ¶ 111.

In Count V, claiming the same constitutional violation against the Municipal Defendants, *id*. ¶ 116, plaintiffs allege that there were "multiple incidents of misconduct" on the football team over a period of years "that showed a systemic pattern of activity." *Id*. ¶ 115. The Municipal Defendants knew of the complaints and yet "actively failed to respond to them." *Id*. They failed to train the coaching staff until "after John Doe's incident." *Id*. They did not require that students be supervised in locker rooms despite "the recommended best practice." *Id*. Finally, they did not create athletics program handbooks and policies until August 2022. *Id*.

To establish a substantive due process claim, a plaintiff must show deprivation of a protected interest in life, liberty, or property that was caused by government conduct. *Rivera v. Rhode Island*, 402 F.3d 27, 33-34 (1st Cir. 2005). Here, plaintiffs allege that defendants violated Doe's constitutional right to bodily integrity. (#1 ¶¶ 106, 116.) *See Albright v. Oliver*, 510 U.S.

23

266, 271-72 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). Plaintiffs allege that school officials violated this right by failing to protect Doe from the actions of other students.

In general, "a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 197 (1989), "because the purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protects them from each other." *Rivera,* 402 F.3d at 34. One limited exception to this rule is that the state has an obligation to safeguard an individual with whom the state has a "special relationship," an antiseptic term describing a situation in which a person is held by the state against his will, for example, when a person is incarcerated, involuntarily institutionalized, or otherwise restrained so that they cannot protect themselves. *Thomas,* 267 F. Supp. 3d at 297 (quoting *DeShaney*, 489 U.S. at 197-200).

Courts generally have declined to find that children in public schools are akin to prisoners or people involuntarily confined to mental hospitals. *See Hasenfus v. LaJeunesse*, 175 F.3d 68, 71-72 (1st Cir. 1999) (citing *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 655 (1995) (holding that public schools do not have such a degree of control over students as to give rise to "duty to protect")); *Thomas,* 267 F. Supp. 3d at 297-98 (collecting cases). In *Hasenfus*, however, the First Circuit posited that "in narrow circumstances the Supreme Court might find a due process obligation of the school or school employees to render aid to a student in peril." 175 F.3d at 72. Such "narrow circumstances" might include a scenario in which a teacher knew that a student had a heart attack in a classroom and left "[the student] there to die without summoning help" or one in which a six-year-old student fell down an elevator shaft and the school principal ignored what

had happened. *Id.* The court made clear that the "duty to protect" would only arise from extreme behavior on the part of officials: "Outside of a few narrow categories, like the safeguarding of prisoners who have been wholly disabled from self-protection, this means conduct that is truly outrageous, uncivilized, and intolerable." *Id.*

In *Thomas*, where a student was raped with a broomstick by other students at a football sleep-away camp, the district court found that the incident did not qualify as one of the "narrow circumstances" described by the First Circuit, because there was no allegation that school officials knew that the student was being raped and failed to intervene. 267 F. Supp. 3d at 298. The same reasoning applies in this case. It is not alleged here that school officials knew that Doe was in great peril and yet deliberately ignored him. The facts alleged, that Athletic Director Duran did not require that students be supervised while in locker rooms, or that Principal Callanan instituted ineffectual remedial measures after the incident, or that Assistant Coach Andrews was in a nearby room during the locker room incident and must have heard the commotion and yet did not investigate and then failed to report the incident after being told about it by Doe, are nowhere near as sinister as the "narrow circumstances" that the First Circuit suggested would rise to the level of a constitutional violation. Similarly, the incident where Ms. Webber, the Spanish teacher, "did nothing" while a student came into her classroom and threatened Doe by grabbing his shirt and verbally threatening him cannot be compared to one in which an official knew that a student was having a life-threatening medical crisis and left him to die, leading one to wonder why she was even brought into this lawsuit. The same rationale applies to the claim against the Municipal Defendants. Regardless of the blameworthiness of the City, WPS, or WSC in failing to address the culture of bullying or to see to it that students were supervised in locker rooms, the shortcomings

set out in the complaint just do not make out a constitutional violation under the "special relationship" theory.

The Supreme Court in *DeShaney* also alluded to another possible avenue to liability, the "state-created danger" theory, 489 U.S. at 200, where "a state official acts so as to create or even markedly increase a risk" to an individual and thus has an affirmative duty to protect them. *Hasenfus*, 175 F.3d at 73. In order to plead this theory, a plaintiff must adequately allege that a state actor or actors affirmatively acted to create or enhance a danger to plaintiff; that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public; that the act or acts caused the plaintiff's harm; and that the state actor's conduct, when viewed in total, shocks the conscience. *Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020), *cert. denied*, 142 S.Ct. 74 (2021). "Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience," while in situations where state actors "must act in matter of seconds or minutes, a higher level of culpability is required." *Id*. "The burden to show state action that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even resulting from bad faith to something more egregious and more extreme." *Melendez–Garcia v. Sanchez*, 629 F.3d 25, 37 (1st Cir. 2010) (internal quotation marks omitted).  The question here can be framed as whether the state action as alleged "shocks the conscience."

Doe cites three cases in support of his argument that the facts alleged here are sufficient to make out a claim under the "state-created danger" theory. (#22 at 8-10.) In the first case cited, *Doe1 v. Boston Public Schools*, Civ. No. 17-11653-ADB, 2019 WL 1005498 (D. Mass. March 1, 2019), the plaintiffs claimed that several children repeatedly were sexually assaulted over a period of years by another student. *Id*. at *4. School officials knew the student was perpetrating sexual

abuse, but nevertheless the principal of the school discouraged teachers from filing reports about the assaults as they were required to under Mass. Gen. Laws ch. 119 § 51A ("51A reports") and even fired a teacher in retaliation for filing a 51A report. Further, when parents requested a safety plan, the principal instructed school staff not to provide one. *Id*.

District Court Judge Burroughs found that plaintiffs "narrowly alleged" sufficient facts to survive a motion to dismiss the state-created danger claim. *Id.* "[A]lthough it is a very close question," she held that one could infer that by "suppressing and delaying the filing of 51A reports and firing a teacher in retaliation for filing such a Report," defendants' actions left the children more vulnerable to assault. *Id.* The "affirmative acts of concealment and retaliation alleged" amounted to more than school officials' knowledge of the assaults or failure to intervene, rather, the school officials "plausibly enhanced the threat of harm [to the children] and proximately caused their injuries." *Id*. at *5. The school officials' actions "shock the conscience" because the events in question happened over a period of years, so that they had time to consider the situation and make "unhurried judgements," *id*. (citing *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)), and yet they chose to ignore the obvious danger to the children, failed to file 51A reports as they were required to by law, and allowed the children to be repeatedly assaulted. *Id*.

The second case cited by plaintiffs is *Doe v. Gavins*, Civ. No. 22-10702-ADB, 2023 WL 6296398 (D. Mass. Sept. 27, 2023), also decided by Judge Burroughs, concerning the same school and school officials as the *Doe1* case, above. There, plaintiffs also brought a § 1983 claim under the state-created danger theory, where two children in the school were frequently bullied, physically assaulted, and sexually abused and harassed over a period of many years. *Id*. at *3-6. Plaintiffs alleged that the City of Boston and school officials, through their actions, created an unsafe environment at the school, which left the children at greater risk to sex-based and physical

assaults by other students. *Id.* at *1. Judge Burroughs again found that plaintiffs had "narrowly alleged sufficient facts" that defendants had engaged in affirmative acts to survive a motion to dismiss, where the same principal as in the previous case actively suppressed the filing of reports of bullying and discouraged the filing of 51A reports, falsified one plaintiff's disciplinary records in retaliation for the parents' raising concerns to the superintendent of schools, and protected rather than disciplined students who bullied others. *Id.* at *7. These actions by the principal "plausibly enhanced the threat of harm to [the children] and proximately caused their injuries." *Id.* The actions shocked the conscience because plaintiffs pled that over a period of several years, both children suffered numerous incidents of abuse, the incidents escalated in frequency over time, school officials knew of the risk and continued to take actions that worsened the situation, they ignored the parents' multiple communications of concern about the harm to their children, and the principal implied that the children were responsible for the abuse perpetrated on them by other students, did not institute safety plans to protect one child, and admitted that she did not file reports concerning the abuse of the child because the incidents were so frequent. *Id.* at *8.

The third case cited by plaintiffs is *Doe v. Regional Sch. Unit No. 21*, Civ. No. 2:19-00241-NT, 2020 WL 2820197 (D. Me. May 29, 2020), where the district court denied a motion to dismiss, finding that plaintiff had adequately pled a claim under the state-created danger theory. There, school officials were on notice that a teacher was sexually abusing a 17-year-old student in school and yet failed to reasonably investigate or initiate remedial action, thus increasing the harm to the student, who continued to be abused and eventually committed suicide. *Id.* at *3.

None of the above cases is factually similar enough to this one to warrant the court's finding that plaintiff has sufficiently alleged that defendants affirmatively acted to increase the threat of harm to Doe or affirmatively prevented him from receiving assistance. *See Irish*, 979 F.3d at 74.

The claims against defendants here, that, for example, Principal Callanan instituted ineffective protective measures after the locker room incident, or that the coaches promoted bullying, or that Ms. Webber "did nothing" while a student entered her class and bullied Doe, are not comparable to the inexplicable actions of the principal in Judge Burrough's Doe cases, who actively worked to prevent teachers from filing 51A reports over a long period of time and took other actions, such as falsifying records, that exacerbated repeated sexual and physical assaults perpetrated by one student against numerous others. Nor can any of the defendants' alleged actions in this case be said to "shock the conscience" as did defendants' actions in *Doe v. Regional Sch. Unit No. 21*, 2020 WL 2820197, where defendants were on notice that a young man was being sexually abused by a teacher and yet not only did not investigate but also permitted the teacher to continue to have unsupervised access to him, causing him to be further abused. *Id*. at *3. As in *Thomas*, 267 F. Supp. 3d at 299-300, the court here finds that notwithstanding the seriousness of the harm done to Doe by his fellow students, when one concentrates on what defendants did, as the court must do, plaintiffs have failed to state a substantive due process claim against either the individual or the Municipal Defendants.

The court recommends that defendants' motion to dismiss Counts IV and V be allowed.

E.  Count VI, Violation of Title VI, 42 U.S.C.  § 2000(d) et seq., Against the City, WPS and WSC.

Plaintiffs claim that the Municipal Defendants violated Title VI of the Civil Rights Act of 1964 by "discriminat[ing] against John Doe based on race and color by treating him differently and causing him harm during the 2021 football season. John Doe, who is Hispanic, received less playing time after the assault on September 25, 2021, while the player who sexually assaulted him, who is white, continued to play on the football team in a primary role, including at the Thanksgiving game at Fenway Park." (#1 ¶ 123.)

Title VI states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial assistance." 42 U.S.C. § 2000d. Doe must sufficiently plead, among other things, that the school acted with discriminatory intent. *Doe v. Brown University*, 43 F.4th 195, 208 (1st Cir. 2022) (citing *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004)). As stated above, the facts supporting this claim in the Complaint are that Doe is Hispanic; his assailant was white; and Doe received less playing time after the incident than his assailant did. These facts do not allow one to draw the reasonable inference that Doe was discriminated against because of his ethnicity. The court recommends that Count VI be dismissed.

F. Count VII, Intentional Infliction of Emotional Distress Against Principal Callanan.

"The standard for making a claim of intentional infliction of emotional distress is very high." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996) (citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976)). To make out this claim, a plaintiff must show that the defendant intended, knew, or should have known that her conduct would cause emotional distress; that the conduct was extreme and outrageous, "beyond all possible bounds of decency and was utterly intolerable in a civilized community"; that the conduct caused emotional distress; and that the emotional distress sustained by the plaintiff was severe. *Polay v. McMahon*, 468 Mass. 379, 385 (2014); *Conway v. Smerling*, 37 Mass. App. Ct. 1, 8 (1994). "Outrageous" in this context means "a high order of reckless ruthlessness or deliberate malevolence that … is simply intolerable." *Id.*

As factual support for this claim, the Complaint references Principal Callanan's "acts and omissions" as described in the Complaint, (#1 ¶ 126), including, among other things, that she was

aware of and permitted the toxic culture of bullying and assault on the WMHS football team, *id.* ¶¶ 73-76; she assured Doe that he would be safe at school after the incident, but he was subjected to further harassment, *id.* ¶¶ 38-39, 44-49, 57; and she did not make a safety plan for the student who assaulted Doe until December 2021, *id.* ¶ 51. (#22 at 20.)

None of the facts rise to the level of the "profoundly shocking conduct" required to plead this claim. "A reasonable jury … could not find that the defendant's actions were the sort of targeted, deliberate, and malicious conduct that is required for an [intentional infliction of emotional distress] claim." *Roe v. Lincoln-Sudbury*, 2021 WL 1132256, at *44; *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987). "Massachusetts courts have found that the 'passive conduct' of 'fail[ing] to act in preventing or remedying the bullying' of a student by other students is insufficient to state a claim for [intentional infliction of emotional distress]." *Roe v. Lincoln-Sudbury*, 2021 WL 1132265, at *44 (quoting *Morgan,* 138 F. Supp. 3d at 94). *Compare Thomas*, 267 F. Supp. 3d at 312 (plaintiff adequately pled intentional infliction of emotional distress against two teachers who allegedly ridiculed rape victim in front of his classmates for reporting a sexual assault to police and school officials).

The court recommends that Count VII be dismissed.

G.  Count VIII, Negligence Against the City and WPS, and Count IX, Negligent Infliction of Emotional Distress Against the City and WPS.

With regard to Count VIII, negligence, plaintiffs allege in the Complaint that the "conduct of the named Defendants was the original cause that materially contributed to creating the condition and situation that resulted in the negligent actions and omissions" that harmed the plaintiffs, (#1 ¶ 132); that the defendants owed a "duty to exercise reasonable care" to Doe and his parents, *id.* ¶ 133; that Principal Callanan gave plaintiffs assurances of safety, "yet John Doe continued to be attacked, bullied and injured at school," *id.* ¶ 134; and plaintiffs suffered damages

as a result, *id*. ¶ 136. In their opposition to defendants' motion to dismiss, plaintiffs further explain that the City and WPS "placed John Doe in an unsupervised sports environment with a known, allowed, and promoted culture of assault and bullying and despite best practices for supervision of locker rooms, thereby meeting the original cause requirement." (#22 at 16.)

To state a negligence claim under Massachusetts law, a plaintiff must allege that 1) the defendant owed the plaintiff a duty of reasonable care; 2) the defendant breached that duty; 3) damage resulted; and 4) defendant's breach caused that damage. *Saldivar v. Racine*, 818 F.3d 14, 20-21 (1st Cir. 2016) (citing *Jupin v. Kask*, 447 Mass. 141, 146 (2006)). Under Massachusetts law, "[w]hether negligent conduct is the proximate cause of an injury depends … on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." *Id*. (citing *Kent v. Commonwealth*, 437 Mass. 312, 320 (2002)).

To adequately plead a claim for negligent infliction of emotional distress, plaintiffs must sufficiently allege negligence; emotional distress; causation; physical harm manifested by objective symptomology; and that a reasonable person would have suffered emotional distress under the circumstances of the case. *Payton v. Abbott Labs*, 386 Mass. 540, 556-57 (1982).

For both these claims, an initial question is whether these defendants may be sued under Massachusetts law. The Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, states that public employers shall be liable for "personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same matter and to the same extent as a private individual under like circumstances …" Mass. Gen. Laws ch. 258 § 2. The statute allows for exceptions to the general waiver of sovereign immunity, however, *see* Mass. Gen. Laws ch. 258, § 10 (a)-(j). In particular, "§ 10 (j) bars 'any claim based on an act or failure to act to prevent or diminish the harmful

consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.'" *Cormier v. City of Lynn*, 479 Mass. 35, 39 (2018) (quoting Mass. Gen. Laws ch. 258 § 10 (j)). Put another way, § 10 (j) "eliminates government liability for a public employer's act or failure to act to prevent harm from the wrongful conduct of a third party *unless* the condition or situation was '*originally caused*' by the public employer." *Id*. at 40 (quoting *Brum v. Dartmouth*, 428 Mass. 684, 692 (1999)) (emphasis in original). "To have 'originally caused' a condition or situation under § 10 (j), the public employer must have taken an affirmative action; a failure to act will not suffice." *Id*., (quoting *Brum*, 482 Mass. at 692, 695).

Section 10 (j) further provides that the above exclusion shall not apply to "any claim based upon explicit and specific assurances of safety or assistance … made to the direct victim or a member of his family … by a public employee, provided that the injury resulted in part from reliance on those assurances." § 10 (j)(1). Nor shall the exclusion apply to "any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was before the intervention." § 10 (j)(2).

Plaintiffs argue that the defendants are not immune from suit because placing Doe "in an unsupervised sports environment" with a culture of assault, "despite best practices for supervision of locker rooms" meets the "original cause requirement" of § 10 (j). (#22 at 16.) In addition, Principal Callanan's assurances that Doe would be safe at school, on which plaintiffs relied but which did not result in his being safe and in fact caused him to suffer further injury, meet the requirements of §§ 10 (j)(1) and (2). *Id*. at 16-17.

As the Supreme Judicial Court stated in *Brum*, "[i]t is clear … that § 10 (j) was intended to provide some substantial measure of immunity from tort liability to government employers." 428

<u>Mass. at 692</u>. The court cautioned that "we must not adopt an interpretation of the statute that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances." *Id*.  Courts have dismissed claims against schools for failure to prevent or address peer-to-peer bullying and harassment where the school cannot be considered the "original cause" of plaintiff's injury. *See Hankey*, <u>136 F. Supp. 3d at 75-76</u> (holding that where there was no evidence that the school had caused plaintiff to suffer harassment, defendants were not the "original cause" of plaintiff's situation and so were not negligent); *Harrington v. Attleboro*, <u>172 F. Supp. 3d 337, 349</u> (D. Mass. 2016) ("[E]ven accepting as true Plaintiffs' allegations that Attleboro and its employees failed to implement certain policies addressing bullying or that its response to [the student's] bullying was inadequate, Plaintiffs have not adequately alleged that Attleboro or its employees 'materially contributed' to creating a specific situation such that they 'originally caused' [the student's] harassment and bullying by her peers") (collecting cases).

The alleged "boys-will-be-boys" culture does not meet the standard for "originally causing" plaintiffs' injuries. Assuming such a culture existed as alleged, it simply does not follow that it "caused" plaintiff to suffer sexual harassment as he did. None of the examples that plaintiffs give of other students' being bullied or injured as a result of the culture have anything to do with sexual harassment. Neither can Principal Callanan's allegedly ineffectual efforts to protect Doe despite her assurances to the contrary be said to have "resulted" in any further injuries to Doe for purposes of evaluating immunity. The only case plaintiffs cite in support of their argument that defendants are not immune is *Thomas*, <u>267 F. Supp. 3d at 313</u>. (#22 at 16.) There, the district court found that the plaintiff's negligence claims survived dismissal because he adequately pled that "the original cause of the injuries he suffered was an affirmative act by the school that placed him

in an unsupervised overnight sports environment with known bullies." 267 F. Supp. 3d at 313. The fact that "the school took affirmative action to sponsor an off-campus athletic camp supervised by school personnel" was critical to the analysis. *Id.* Here, in contrast, all the events complained of took place in the school building during regular business and nothing about the facts suggests that the school should have been on notice that Doe was in danger of being sexually assaulted.[5]

The court finds that defendants are immune from suit on plaintiffs' negligence claims and recommends that Counts VIII and IX be dismissed.

H. <u>Count X, Jeanny and Kevin Coucelos' Claims for Loss of Consortium Against the City, WPS, and Principal Callanan.</u>

Massachusetts provides a statutory cause of action for a parent to recover damages for loss of consortium when the parental relationship is impacted by serious injuries to a minor or dependent child at the hands of a tortfeasor. Mass. Gen. Laws ch. 231, § 85X. Consortium claims require an underlying tortious act. *See Sena v. Commonwealth*, 417 Mass. 250, 264 (1994). As the court has found that plaintiffs did not adequately plead intentional infliction of emotional distress against Principal Callanan, they do not state a claim against her for loss of consortium. Neither have plaintiffs made out any tort claim against the City or WPS. The court recommends that Count X be dismissed.

V. <u>Recommendation.</u>

As explained above, the court RECOMMENDS that defendants' motion to dismiss Count I, alleging discrimination against Doe on the basis of gender in violation of Title IX, be DENIED; Count II, alleging "erroneous outcome" of the Title IX investigation, be DENIED; Count III,

---

[5] Given that the court finds that defendants are immune from suit under § 10 (j) the court need not address the parties' arguments concerning whether § 10 (b) also affords immunity to defendants because they were exercising or failed to exercise a "discretionary function" when they committed the alleged acts.

retaliation against Doe for reporting the assault, be DENIED; Counts IV and V, alleging violation of Doe's constitutional substantive due process right to freedom from violation of bodily integrity, be ALLOWED; Count VI, alleging discrimination against Doe on the basis of race under Title VI, be ALLOWED: Count VII, alleging intentional infliction of emotional distress on plaintiffs by Principal Callanan, be ALLOWED: Counts VIII and IX, negligent and intentional infliction of emotional distress on plaintiffs, be ALLOWED; and Count X, alleging loss of consortium under Massachusetts law, be ALLOWED.

## VI.  Review by the District Judge.

The parties are advised that any party who objects to this Report and Recommendation must file specific written objections with the Clerk of this Court within fourteen (14) days of the date of this Report and Recommendation. The objections must specifically identify the portion of the Report and Recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for the First Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–9 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

June 18, 2024                                   /s/ M. Page Kelley
                                                M. PAGE KELLEY
                                                United States Magistrate Judge